Williams, Judge,
delivered the opinion of the court:
The plaintiff in this suit seeks to recover the sum of $11,785.62, which represents the difference between the amount claimed by it for transporting aliens to be deported and the amount paid by the defendant for that service.
The transportation was furnished in accordance with contracts made on July 8, 1931, between the plaintiff and the Department of Labor. These contracts are set out in Finding No. 2 and provide that for parties of less than 25 transported from San Francisco and Los Angeles to New York and from New York to Los Angeles and San Francisco the rate would be $80 per capita, plus the cost of meals and guards, and for parties or individuals from other points regular tariff rates would apply, plus the cost of guards and meals.
The contracts also provided that the transportation furnished would cover carriage in coaches and reclining chair cars on rail lines and in cabin or third class aboard ship. They also provided that women, children, and physically defective men might be transported in second cabin accommodations on vessels between New York and New Orleans, but that the difference between the third and second class rates between said points would be added to the minimum rate when such cabin space was used. It was also provided that the aliens should not be transported in standard sleeping cars or in first cabin aboard ship.
For the services performed during the fiscal year 1932, plaintiff rendered its bills against the United States to the Department of Labor, based on first-class fares, where under the agreement “regular tariff rates” were applicable. The Government refused to pay the bills in the full amount rendered, revised the fares from first-class to lower coach fares for men, and from first-class to lower intermediate fares for the women and children, and paid plaintiff correspondingly less than billed.
*528 The first-class fares claimed by the plaintiff in its bills against the United States were in effect at the time of service, and entitled the ticket holder to accommodations in standard Pullman cars, upon additional payment of the Pullman fare.
There were also in effect at the time of service the coach fares applied by the Government’s accounting officer, sometimes termed second-class fares. These fares were lower than the first-class fares, did not allow the free carriage of as much baggage, were available only in coaches, and had other restrictions that the first-class fares did not have. They had been put in force by the carriers for the purpose of increasing the patronage of those not ordinarily travel-ling in standard Pullman cars, a patronage which had been declining for some time due to the popularity of travel by private and public automobile. The tariffs establishing them were issued for stated periods, unlike the tariffs containing first-class fares, which were issued effective until cancelled or superseded by other tariffs.
At the time of this service there were in effect also certain “intermediate-class” fares, used by the accounting officer, good in Pullman tourist sleeping-cars upon payment of the Pullman fare for travel in tourist sleeping-car. These intermediate fares were not good in standard Pullman cars.
There were no fares published and filed with the Interstate Commerce Commission specifically named to apply in the special equipment furnished as hereinafter described for the transportation of alien deportees. The only fares specified in any agreement of record in this case for the service here performed are those provided for in the two agreements set forth verbatim in Finding No. 2.
. The defendant concedes that the Government is bound to pay the contract rate of $80.00 per capita for the transportation of the alien deports from San Francisco and Los Angeles to New York. The only question presented therefore is whether “regular tariff rates” provided in the contract for transportation of parties or individuals from points other than San Francisco and Los Angeles required the charges for said service to be at first class rates claimed by *529 the plaintiff or at the second-class coach and intermediate and mixed class fares used by the defendant.
Plaintiff contends that the service rendered was special and afforded special benefits not available to the general public and that the “regular tariff rates” that should be applied in assessing the charges are the higher first class rates.
■ Defendant contends that since the transportation was restricted to carriage in coaches or reclining chair cars on rail lines and in third cabin or steerage aboard ship, excepting women, children, and physically defective men, the “regular tariff rates,” referred to in paragraph 8 of the contracts, required the application of the lower second class coach and intermediate and mixed class fares, which were lawfully published and filed with the Interstate Commerce Commission and in effect and open to the general public at the time the service was rendered.
The contracts herein followed previous annual agreements between the parties with respect to rates for the transportation of aliens being deported by the United States. For this service the United States required special equipment, adapted to the necessities of that type of transportation. Means were required by the United States and furnished by the carriers whereby the escape of the deportees was rendered difficult or impossible during transit. To this end the railroad carriers fastened steel bars on the outside of the ■coaches over the windows, together with a steel wire mesh, and at each end of the coach was built a wire mesh cage for the guards with doors and locks.
Locks were removed from the toilets to prevent deportees from locking themselves in.
Women and children, and sometimes physically defective men, were provided by the carriers with a Pullman tourist car, likewise barred and fitted with means to prevent escape.
Meals were served to the deportees at their seats and tables were placed between the seats for that purpose and for the further purpose of card playing or other ways of keeping them comfortable and occupied. This service was not available to the coach-riding public. The defendant required a *530 limitation to 30 deportees to each car, where in ordinary-commercial travel the car would seat over twice that number. This requirement was for sanitary reasons and to make things more comfortable for the deportees, so that they might lie down, relax, sleep, and rest.
This equipment was held and used by the carriers for this special service. The defendant required that it move at the head end of the train, so that it might be under better control by the immigration inspectors and free from the intrusion of the train crew. From this equipment the defendant excluded the public.
Guards and matrons were provided by the railroads, and meals furnished in accordance with the agreements herein-above referred to.
The service was performed in cars of an extraordinary type, equipped in a manner not used for commercial business. Their conversion from ordinary coaches and tourist cars was material and substantial. In addition to their alteration the converted cars were specially handled in traffic and their occupants given attention and service to which the public, travelling in coaches and tourist cars, was not entitled. They were not, we think, the coaches and tourist cars to which the tariffs offering second-class coach and intermediate tourist fares were intended to apply.
At the time the agreements herein were entered into these cars, converted as above described, were available to the Government, and it was understood by the parties that they would be used in the manner described for the services contracted for.
The plaintiff is entitled to recover on the basis of the allowance of first-class fares where under the agreements “regular tariff rates” were to apply, and on the basis of the agreed $80.00 per capita from San Francisco and Los Angeles to New York for parties of less than 25. Judgment is therefore awarded the plaintiff in the sum of $11,185.62.
It is so ordered.
Whaley, Judge; Littleton, Judge; GReen, Judge; and Booth, Chief Justice, concur.